IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FOR SMITH DIVISION


GREGORY A. PITTMAN                   .                                    PLAINTIFF


         V.                          Civil No. 2:20-cv-02014-PKH-MEF

ANDREW M. SAUL, Commissioner,
Social Security Administration                                            DEFENDANT


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Gregory Pittman, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration ("Commissioner") denying his claims for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. 42 U.S.C. § 405(g).

**I.      Procedural Background**

Plaintiff filed applications for DIB and SSI on March 10, 2017, alleging an onset date of October 15, 2016, due to blood clots, seizures, cellulitis, bilateral leg edema, morbid obesity, hypertension, anemia, gastroesophageal reflux disease (GERD), anxiety, bilateral pulmonary embolism, vein thrombosis, lymphedema, and migraines. (ECF No. 10, pp. 79-80, 112-113, 217-

220, 236, 310). The Administrative Law Judge ("ALJ") held an administrative hearing on June 4, 2018. (*Id*. at 35-80). Plaintiff was present and represented by counsel.

Plaintiff was 34 years old on his alleged onset date with past relevant work ("PRW") experience as a janitor and institutional cook. (*Id*. at 26, 257-262).

On July 3, 2019, the ALJ found Plaintiff's obesity, thrombosis, hemostasis, and peripheral neuropathy to be severe impairments. (*Id*. at 19). He concluded Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*. 20). As such, the ALJ found Plaintiff capable of performing a full range of light work. (*Id*. at 21). Utilizing the grids, he then determined there are jobs that exist in significant numbers in the national economy that the claimant can perform. (*Id*. at 27).

The Appeals Council denied review on December 11, 2019. (*Id*. at 6-11). Subsequently, the Plaintiff filed a timely Complaint with this Court. (ECF No. 3). Both parties have filed appeal briefs (ECF Nos. 13, 15), and this matter is ready for Report and Recommendation.

## II.     Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because

the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III. Discussion

Of particular concern to the undersigned is the ALJ's failure to include all the Plaintiff's limitations in the RFC. Specifically, we are concerned the ALJ did not consider Plaintiff's lymphedema, back and neck pain, and obesity in combination with his other impairments, as is required. RFC is the most a most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). "The ALJ determines a claimant's RFC based on all the relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a claimant's RFC is a medical question and must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)); *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

SSR 19-2p provides guidance for the evaluation of obesity in disability cases. Although not a listed impairment, the "functional limitations" resulting from obesity can medically equal a listing when considered singularly or in combination with other impairments. *See Titles II and XVI: Evaluating Cases Involving Obesity*, SSR 19-2p (S.S.A. 2019). SSR 19-2p recognizes that the combined effects of obesity with other impairments may be greater than the effects of either impairment considered alone. *Id*. This is because obesity increases stress on an individual's weight-bearing joints, often contributing to limitations in range of motion in both the skeletal spine and the extremities. *Id*. It may also limit or contribute to limitations in the individual's ability to sit, stand, walk, lift, carry, push and/or pull, climb, balance, stoop, and crouch. *Id*.

In February 2011, Plaintiff fell and fractured his left ankle. (ECF No. 10 at 715). X-rays of the ankle revealed a closed tibiotalar dislocation with distal medial lateral malleolar fractures. (*Id*. at 713). On February 17, Plaintiff underwent open reduction and internal fixation of the fractures. (*Id*. at 719). Thereafter, he developed an extensive deep vein thrombosis (DVT) in his left leg and bilateral pulmonary embolisms, necessitating a seven-day hospitalization and placement of a filter in his vena cava to prevent blood clots from traveling into the lungs. (*Id.* at 749-882). During his admission, Plaintiff also suffered a series of seizures, later determined to be pseudoseizures, and a code blue. (*Id*. at 725, 756). Plaintiff was treated via the anticoagulants Lovenox and Coumadin. Following discharge, he participated in physical therapy to rehabilitate his left ankle. (*Id*. at 940-964, 968-989). Unfortunately, the Plaintiff continued to experience pain and edema in his left leg and a recurrence of his DVT in September 2015. (*Id.* at 888, 1012, 1040, 1084, 1091, 1101, 1133, 1196, 1201, 1233, 1241). It is noted that he was not prescribed an anticoagulant at the time of the recurrence. (*Id*. at 363-368, 462-464, 1267). However, at that time, Plaintiff was advised he would need to take the anticoagulant Xarelto for the rest of his life.

In November 2015, Plaintiff was treated for cellulitis of the left lower extremity. (*Id*. at 458-461). Despite compliance with the Xarelto, elevating his legs as directed by his doctor, participating in PT, and performing range of motion exercises at home, his condition remained unchanged for two months. (*Id*. at 446-450, 450-455, 1265-1275). On January 4, 2016, his symptoms were noted to have decreased significantly. (*Id*. at 446-450).

In June 2016, however, the edema had returned and in July 2016, when Plaintiff underwent his functional capacity evaluation (FCE), he again described bilateral lower extremity pain and swelling, rendering him unable stand and walk for prolonged periods. (*Id*. at 373, 431-436, 441-445, 530-534). Further, he was only able to wear flip flops or sandals, due to the swelling. Plaintiff

5

also exhibited a limited range of motion in both ankles and knees and an antalgic gait. Jennifer Cauthen, the physical therapist completing the evaluation, concluded Plaintiff could sit for 30 minutes, walk for 6 minutes, stand for 10 minutes at one time, perform elevated work for 30 minutes, lift a total of 30 pounds, and carry 35 pounds on the right and 25 pounds on the left. She also opined he would be limited in his ability to bend, crawl, crouch, and climb ladders. Additionally, Ms. Cauthen voiced her concerns that the Plaintiff may have expended suboptimal effort during testing.

By July 15, 2016, Plaintiff reported significant improvement in his symptoms. (*Id*. 426-427). On August 25, 2016, cardiologist, Dr. Julio Schwarz, examined him for symptoms of precordial chest pain and dyspnea on exertion. (*Id*. at 382-387, 417-421, 470). The exam revealed 3+ pitting edema[1] in the ankles and pretibial area, left more than right, resulting in a diagnosis of peripheral edema. His condition was noted to be significantly improved; however, Plaintiff was referred to occupational therapy for compression wraps to treat his lymphedema[2]. (*Id*. at 412-414, 540-547). Because he had started a new job requiring him to be on his feet for many hours per day[3], occupational therapist, Christine Capehart, determined Plaintiff would benefit from learning

---

[1] Doctors use a grading scale to measure pitting edema. *See* Mayo Foundation for Education and Research, *How to Identify Pitting Edema*, https://www.medicalnewstoday.com/articles/321773#:~:text=This%20is%20the%20least%20severe,of%208%20mm%20or%20deeper (Last accessed December 9, 2020). It is rated on a scale of one to four, with four being the most severe. *Id*. 3+ pitting edema means pressure leaves an indentation of 5–6 mm and takes up to 30 seconds to rebound after the pressure is removed. *Id*.

[2] Lymphedema is swelling in the arms or legs due to damage to the lymph nodes in that area. *See* May Foundation for Education and Research, *Lymphedema*, at https://www.mayoclinic.org/diseases-conditions/lymphedema/symptoms-causes/syc-20374682#:~:text=Lymphedema%20refers%20to%20swelling%20that,a%20part%20of%20cancer%20treatment. (Last Accessed December 14, 2020). In addition to swelling, symptoms can include restricted range of motion, tightness and/or fullness, and recurrent infections. *Id*. Treatment includes individual protection of the affected extremity, rest, and elevation above heart level to prevent further complications. *Id*.

[3] The ALJ made the following finding regarding Plaintiff's work:
> He testified that he engaged in work activity through the TEA (Transitional Employment Assistance) Program, which provides temporary assistance to persons who are a caretaker of a child under the age of 18. However, the claimant testified that he was unable to complete the amount of work activity required by this program because of his alleged impairments (Hearing Notes). Given the limited amounts received by the claimant under the TEA Program and the claimant's testimony that he was unable to perform the work as required due to limitations caused

how to wrap his ankle at home. Unfortunately, despite treatment compliance, he continued to exhibit edema in both lower extremities in October 2016.

On April 28, 2017, Plaintiff exhibited leg pain, changes in the skin color from his lower leg up to his groin, and edema in his lower extremities. (*Id*. at 514-520). Fortunately, a venous doppler was negative for a recurrence of DVT. (*Id*. at 520-521).

On July 10, 2017, Plaintiff voiced continued complaints of bilateral extremity pain, with the left more pronounced than the right. (*Id*. at 642-647). At this time, he also exhibited 2+ pitting edema in the left lower extremity to the mid-sock line (approximately 22 centimeters) and 18 centimeters of edema on the right. Lasix was added to his medication regimen, and a venous doppler was again negative for DVT. (*Id*. at 663-664). On July 18, Plaintiff reported some improvement; however, he continued to exhibit edema. (*Id*. at 647-650). His Lasix dosage was increased, which resulted in additional improvement by August. (*Id.* at 651-655). He was also referred to a podiatrist for an evaluation of his gait abnormality.

On September 27, 2017, podiatrist, Kenneth Seiter, Jr., treated Plaintiff for complaints of chronic left lower extremity pain and swelling. (*Id*. at 580-587). Plaintiff rated his ankle pain as a 7 on a 10-point scale, describing it as a sharp, achy pain exacerbated by prolonged periods of standing and/or walking. On exam, he demonstrated mild equinus contracture to the left lower extremity limiting dorsiflexion of his knee, firmness and demonstrable pain in the left calf extending to the left ankle, and post-traumatic arthritic pain with range of motion in the left ankle. Although he walked without an assistive device, Dr. Seiter opined that his abnormal gait was a compensatory response to the pain and edema. X-rays of his ankle revealed non-focal edema and

---

by his alleged impairments, the undersigned finds that the claimant has not engaged in substantial gainful activity since October 15, 2016.
(ECF No. 10, p. 19).

remote postoperative changes without acute fracture, subluxation, or signs of hardware failure. (*Id*. at. 585). The doctor diagnosed lymphedema, referred him to a lymphedema specialist, and advised him to perform stretching, strengthening, and range of motion exercises three to four times daily.

On November 8, 2017, a second FCE conducted by occupational therapist, Cynthia L. Mathis, revealed unsafe balance/body mechanics during squats, toe raises, and heel raises. (*Id*. at 569-578). As such, she modified the remaining tasks for safe performance. Plaintiff performed all activities by walking at a steady and slow pace. His blood pressure response, however, was excessive, even at this pace. Ms. Mathis noted that he weight-shifted during activities requiring him to stand and exhibited decreased flexion in the hips and knees; decreased plantarflexion, dorsiflexion, inversion, and eversion in the ankles; and swelling in the left lower extremity. In addition, his left tennis shoe was altered to fit his swollen ankle. Ms. Mathis concluded his balance testing was consistent with left ankle limitations precluding some lifting/climbing tasks. Plaintiff demonstrated the ability to lift a total of 26 pounds from his waist to the floor, sit 30 minutes, walk 6 minutes but with a significant increase in blood pressure, and stand 15 minutes. He had a limited ability to climb stairs due to a significant increase in both blood pressure and heart rate, even with the use of the handrail. And, due to balance issues, Plaintiff's ability to crouch, kneel, and climb ladders was not tested.

On November 14, 2017, Dr. George Zabakolas diagnosed left lower extremity lymphedema. (*Id*. at 659-662). Dr. Jeffrey Medlock provided Plaintiff with a note for work on December 5, 2017, stating Plaintiff could not stand for prolonged periods and needed a desk job because he was taking an anticlotting medication. (ECF No. 10-1, pp. 31-35).

On January 29, 2018, Plaintiff returned to Dr. Medlock for treatment of chronic left ankle pain and swelling. (ECF No. 10, pp. 588-594). Plaintiff rated his pain as a 5 out of 10, noting it had improved with therapy; however, the pain continued to be exacerbated by prolonged periods of standing or walking. On exam, Plaintiff exhibited minimal to moderate non-pitting edema in the left lower extremity and minimal non-pitting edema in the right lower extremity, with some reduction noted since his previous exam. This reduction in swelling was attributed to therapy and the use of TED hose. Plaintiff also experienced numbness, tingling, and occasional burning in both lower extremities; mild equinus contracture of the left lower extremity limiting dorsiflexion in the knee; firmness of the left calf extending to the left ankle; pain in the left calf and ankle; and post-traumatic arthritic pain on range of motion in the left ankle. He ambulated without assistance but continued to compensate for his pain with an antalgic gait. Dr. Medlock directed him to continue lymphedema therapy and attend physical therapy twice per week.

In March 2018, Dr. Medlock treated Plaintiff for knee pain after falling in the tub in late February. (ECF No. 10-1 at 16, 18-21, 36). X-rays of his left knee revealed stippled calcification at the distal femoral shaft, suggestive of a bone infarct.[4]

On April 3, 2018, Nurse Practitioner Gayla Johnson treated Plaintiff for pleuritic chest pain. (*Id*. at 7-12). She documented 3+ pitting edema in the ankles and pretibial area, left more than right, and evidence of atrophic dermatitis.

On April 26, 2018, Dr. Medlock indicated Plaintiff could not perform any heavy lifting due to back pain. (*Id*. at 13). Although the ALJ stated this was merely a temporary restriction, it provides some insight into Plaintiff's restrictions as contemplated by his treating doctor.

---

[4] A bone infarct is an area of osteonecrosis, often times caused by trauma, but can result in pain, limited motion, a total collapse of the joint, and secondary arthritis. *See* Merck Manual, *Oseonecrosis (ON)*, https://www.merck manuals.com/professional/musculoskeletal-and-connective-tissue-disorders/osteonecrosis/osteonecrosis-on (Last accessed December 16, 2020).

Plaintiff's obesity, back and neck pain, and faulty vena cava filter also contribute to his limitations. On January 4, 2016, Plaintiff was noted to be morbidly obese and quite sedentary. (ECF No. 10, pp. 450-455). During a visit with Nurse Practitioner Janis Bishop on October 14, 2016, he expressed his desire to lose weight. (*Id*. at 409-412). Nurse Bishop provided a general surgery referral for possible weight loss surgery. Although the ALJ points out that the Plaintiff never pursed the possibility of surgery, we do not find this to be a proper reason to dismiss his obesity. There are both immediate and long-term risks associated with this type of surgery that must be considered. *See Titles II & XVI: Failure to Follow Prescribed Treatment*, SSR 82-59 (S.S.A. 1982) (providing a list of reasons why a claimant's failure to follow prescribed treatment may be excused); *see also* Mayo Clinic, *Bariatric Surgery*, at https://www.mayoclinic.org/tests-procedures/bariatric-surgery/about/pac-20394258 (Last Accessed December 11, 2020) (listing the possible risks associated with bariatric surgery). Further, the Administration's own regulation prescribing the proper procedure for considering a claimant's obesity does not suggest that bariatric surgery is an appropriate consideration in determining the limiting effect of one's obesity. *See Titles II and XVI: Evaluating Cases Involving Obesity*, SSR 19-2p (S.S.A. 2019).

The evidence also reveals that Plaintiff actively pursued weight loss via other means. Recognizing the effect his obesity had on his other impairments, by August 2016, Plaintiff had reportedly begun going to the track every other day and walking two laps. (ECF No. 10, pp. 414-417). He also requested Dr. Schwarz's assistance with weight loss. And, by May 2017, he had lost approximately 12 pounds. (*Id*. at 557-562). As late as April 2018, records indicate Plaintiff was performing some exercise to help his pain and help assist with weight control. (ECF No. 10-1, pp. 7-12). Thus, the evidence shows that Plaintiff was actively treating his obesity.

In November 2016, the Plaintiff was also noted to have generalized cervical, thoracic, and lumbar pain with spasms in his left mid thoracic and lumbar spine. (*Id*. at 404-407). X-rays revealed mild multilevel degenerative change without significant disc height loss in the cervical spine; a slight levocurvature of the lower thoracic spine; and very slight anterior wedging at the T12 and L1 levels. (*Id*. at 465-467).

On August 11, 2017, a CT scan of Plaintiff's abdomen found his inferior vena cava filter had penetrated/perforated beyond the wall of the inferior vena cava. (*Id*. at 579, ECF No. 10-4 at 1). One prong of the filter had penetrated/perforated through the inferior vena cava and into the abdominal aorta. The tip of another prong was very near the wall of the abdominal aorta.

On January 10, 2018, Plaintiff voiced concerns that some of his problems might be related to his failing IVC filter. (ECF No. 10-1, pp. 26-30). Dr. Medlock ordered another CT scan of his abdomen, which showed chronic occlusion of the IVF. (*Id*. at 4-5, 37-38; ECF No. 10-4, pp. 4-5). It also revealed disc space narrowing, degenerative changes, and severe disc space narrowing with vacuum disc phenomena at the L5-S1 level.

On May 16, 2018, Dr. Medlock treated Plaintiff for "symptoms of sheer misery" attributed to his IVC filter. (ECF No. 10-1, pp. 39-43). Plaintiff reported difficulty walking and worsening of his back pain. Dr. Medlock recommended early retirement because he felt no one would hire him due to his health issues. He commented that no one would not want the responsibility of covering Plaintiff's health insurance.

On August 10, 2018, Dr. Ahmad Al-Khatib conducted a consultative exam at the request of the Commissioner. (ECF No. 10-5, pp. 6-16). Plaintiff reported low back pain radiating down into his lower extremities, neck pain radiating down both upper extremities, and numbness and tingling in his hands. He exhibited tenderness over the cervical and lumbosacral spinal regions;

11

diminished pinprick, light touch sense, and vibratory sensation in both feet up to his knees; an antalgic gait necessitating the use of a cane; and the inability to perform tandem walk. An electromyography and nerve conduction studies of both his upper and lower extremities revealed electrophysiologic evidence of moderate to severe generalized chronic axonal sensory motor peripheral polyneuropathy. Dr. Al-Khatib concluded Plaintiff could lift/carry 10 pounds frequently and 20 pounds occasionally, but never more. Further, he could sit 15 minutes at one time uninterrupted and for a total of 3 hours total in an 8-hour workday; stand for 15 minutes uninterrupted and for 2 hours total; and he could walk 15 minutes uninterrupted for a total of 2 hours. He noted Plaintiff required the use of a cane, indicating it was medically necessary. Additionally, Dr. Al-Khatib concluded Plaintiff could occasionally operate foot controls, climb stairs and ramps, work near moving mechanical parts, operate a motor vehicle, and work near humidity/wetness, extreme cold, extreme heat, and vibrations; frequently work near dust/odors/fumes/irritants and loud noises; and he should never climb ladders or scaffolds or work near unprotected heights.

The ALJ gave great weight to the assessments of the non-examining consultants, completed in May and July 2017, concluding Plaintiff could perform a full range of light work. (ECF No. 10, pp. 90-91, 122-123). He also credited the FCE completed in 2016, despite the examiner's concern that suboptimal effort many have been expended. He gave no weight to Dr. Al-Khatib's assessment alleging it was a one-time consultative exam, was not supported by the record, and contained internal inconsistencies. The ALJ also found reasons to dismiss most of the statements and recommendations of the remaining treating or examining sources contained in the record.

Unfortunately, the non-examining consultants did not have access to all the Plaintiff's medical records. Further, the overall record reveals that this gentleman continues to suffer from

recurrent lymphedema and chronic pain in his lower extremities despite treatment. Examinations during and after Plaintiff's unsuccessful work attempt suggest that being on his feet exacerbates both his edema and his pain. *See* The Cleveland Clinic, *Edema: What causes edema?*, https://my.clevelandclinic.org/health/diseases/12564-edema (Last accessed December 17, 2020). The fact that Plaintiff is morbidly obese further complicates his situation. We know that excessive weight places additional pressure on the weight bearing joints in the body, especially the lower back and the ankles. This can lead to an exacerbation of existing pain, as well edema, and can result in the need for a sit/stand option and/or the periodic elevation of the lower extremities. It can also limit one's ability to stand and walk for extended periods and perform postural activities such as climbing, crouching, crawling, balancing, and kneeling. Given the traumatic injury to Plaintiff's left ankle and his recurrent lymphedema, it was error for the ALJ not to account for these impairments in the RFC. Therefore, remand is necessary.

On remand, the ALJ should reconsider all the Plaintiff's impairments in combination and account for them in the RFC. In so doing, he should recontact Dr. Al-Khatib to clarify any inconsistencies contained in his examination and assessment. Additionally, the ALJ should order a consultative physical examination, complete with an RFC assessment specifically addressing the impact Plaintiff's lymphedema, obesity, back pain, and failing IVC filter have on his ability to stand and walk six hours per day, his need for a sit/stand option, his need to elevate his lower extremities during an eight-hour workday, and any resulting postural limitations.

## IV. Conclusion

Based on the foregoing, I recommend reversing and remanding this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 21st day of December 2020.

/s/ *Mark E. Ford*
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE